[Civ. No. 13918.   Second Dist., Div. Three.   Feb. 17, 1944.]

A. CAMINETTI, JR., as Insurance Commissioner, etc., Appellant, v. PRUDENCE MUTUAL LIFE INSURANCE ASSOCIATION (a Corporation), Respondent.

Earl Warren, Attorney General, Robert W. Kenny, Attorney General, and John L. Nourse, Deputy Attorney General, for Appellant.

Chas. R. Thompson, Sherman & Sherman and Ralph H. Lewis for Respondent.

SHAW, J. pro tem.—Appellant, as Insurance Commissioner of the State of California, obtained from the Superior Court of Sacramento County an order under section 1011 of the Insurance Code appointing him as conservator of the business of the respondent, Prudence Mutual Life Insurance Association, and pursuant to this order took over its property and business. The respondent is a corporation organized to do life insurance business on the mutual benefit assessment plan. As soon as this order was made, the proceeding was transferred to Los Angeles County. Later, on application of respondent, a hearing was had under section 1012 of the Insurance Code, at the conclusion of which the Superior Court of Los Angeles County entered a judgment cancelling and terminating the former order, dissolving the conservatorship and directing the restoration to respondent of its property and business. From this judgment the Insurance Commissioner appeals.

At the outset of the hearing the trial court was asked to rule upon the question where lay the burden of proof, and after extended argument it announced its opinion that the burden rested on the Insurance Commissioner. Appellant now complains of this as reversible error. The court's declaration of law was erroneous, for it is now settled that on

application by an insurance company under section 1012 of the Insurance Code for the setting aside of an order made under section 1011 of that code, the burden of proof is on the company making the application. (*Caminetti* v. *Guaranty Union L. Ins. Co.* (1942), 52 Cal.App.2d 330, 337 [126 P.2d 159]; *Caminetti* v. *Imperial Mut. L. Ins. Co.* (1943), 59 Cal.App.2d 476, 487 [139 P.2d 681].) But this error does not in itself afford ground for a reversal, under the circumstances of this case. As a result of this declaration of the trial court the commissioner's evidence was produced first, but it does not appear that either party was prevented by it from producing all available evidence, or desired to or could obtain or present anything further. The hearing appears to have been a "full hearing," as required by section 1012 of the Insurance Code.      After the taking of evidence, and just before the entry of judgment, the trial court made an order vacating the submission of the case and reopening it for the purpose of making and did make a further order vacating its ruling on the burden of proof and declaring that it had heard, considered and weighed all of the evidence of both parties and that "regardless of where the burden of proof lay, the decision of this court would not be affected." This order was made seven days after the filing of the first of the decisions on burden of proof above cited and we are informed by the briefs that it was made by reason of that decision. However that may be, it shows that the court vacated its ruling on the burden of proof. We must therefore presume, nothing now appearing to the contrary, that the court weighed and considered the evidence in the light of the proper rule as to the burden of proof.      The only remaining effect of its former ruling is that the appellant was required to proceed first with the production of evidence. But an error in that respect does not ordinarily result in a miscarriage of justice, where all the evidence of both parties is fully presented, and we think it did not here.

Section 1011 of the Insurance Code enumerates among the conditions, the existence of which affords ground for an order appointing the Insurance Commissioner as conservator of an insurance company, the following: "(d) That such person is found, after an examination, to be in such condition that its further transaction of business will be hazardous to its policy holders, or creditors, or to the public. . . . (h) That

any officer or attorney-in-fact of such person has embezzled, sequestered, or wrongfully diverted any of the assets of such person." The word "person" here, as elsewhere in the code, by definition includes corporations and associations. The commissioner's application for the order in this case states as a ground therefor that two of the officers of respondent, Charles E. Fielder and his wife, Eunice H. Fielder, had wrongfully diverted assets of the association to themselves. While the ground provided in subdivision (d) of section 1011 is also stated in general terms in the application, the allegations regarding it are such as to make it dependent for support upon the allegations just referred to regarding the diversion of assets. The charge of diversion is based on the compromise and payment of claims for back salary made against the association by the Fielders. During the whole time covered by the inquiry Charles E. Fielder was a director and general manager of the association and also held either the office of president or that of secretary and his wife, Mrs. Eunice H. Fielder was office manager and vice president and also a director. In February of 1931, 1932, 1933 and 1934, the board of directors of the association consisted of three persons, of whom Mr. and Mrs. Fielder were two, and in each of these months the board adopted a resolution fixing the salary of the "secretary and general manager" at $400 per month and another resolution fixing the salary of the "vice president and assistant secretary" at $200 per month. Apparently all the directors voted for all of these resolutions. The next action taken by the board of directors on officers' salaries was a resolution adopted on September 7, 1935, fixing the salaries of the officers at a maximum of $200 per month "during the existing emergency." In August, 1935, Mr. and Mrs. Fielder signed waivers of all unpaid salaries up to July 31, 1935. No further action regarding officers' salaries was taken up to the time of the compromises hereinafter mentioned. From July 31, 1936, to August 1, 1939, C. E. Fielder drew a salary of $200 per month and Mrs. Fielder drew a salary of $75 per month. On September 5, 1939, Mr. and Mrs. Fielder presented to the board of directors claims for back salaries, Mr. Fielder's for $5,000, and Mrs. Fielder's for $4,775, each of them also making an offer to compromise for $2,550. Mr. Fielder's claim covered the period from May, 1937, to August 3, 1939. On September 13, 1939, the board of directors,

at a meeting at which Mr. and Mrs. Fielder and one other director were present, adopted separate resolutions, for which all the directors voted, authorizing the acceptance of these offers of compromise and the compromise of each of these claims for $2,550. Following these resolutions the amounts of the compromises were paid to Mr. and Mrs. Fielder.

The original salary fixing resolutions under which Mr. Fielder made his claim did not fix a salary for him personally, but merely fixed the salary of "the secretary *and* general manager." (Emphasis ours.) He held these two positions when the resolutions were adopted, but he ceased to be secretary and became president on November 3, 1937, and so remained until August 3, 1939. This interregnum extended over nearly the whole period of time for which he claimed back salary, and during it the salary fixing resolutions did not apply to him. No resolution fixing a salary for the president alone or for the general manager alone, or for both officers together, or otherwise fixing a salary for Mr. Fielder, during this interval, appears to have been passed. Hence the $2,550 payment made to him cannot be upheld as merely a payment of amounts due him under the original salary fixing resolutions. Such a justification of the payment also appears doubtful by reason of the resolution limiting all salaries to $200 "during the existing emergency." This resolution did not specify the nature of the emergency, and the board never passed a resolution declaring it ended, except as the compromise resolution may have had that effect. The rightfulness of the payment to Mr. Fielder depends entirely on the validity of the compromise. The payment to Mrs. Fielder, however, was within the terms of the original salary fixing resolutions and needs no compromise to uphold it.

The law in California formerly was that a director was disqualified from voting on any matter in which he was directly and personally interested and could not be one of a majority essential to the adoption of such a resolution. (6A Cal.Jur. 1107; *Angelus Securities Corp.* v. *Ball* (1937), 20 Cal.App.2d 423, 432 [67 P.2d 152].) That rule was somewhat modified by the adoption of section 311 of the Civil Code, which as it now stands declares that no contract or other transaction between a corporation and one of its directors, or between a corporation and any corporation, firm or association in which one of its directors is financially inter-

ested, shall be void or voidable by reason of the fact that such director is present at the meeting at which the contract or transaction is authorized or approved or that his vote is counted for that purpose, if (a) the fact of his interest is known to the board and the contract or transaction is authorized or approved "in good faith by a vote sufficient for such purpose" without counting that of such director, or (b) the contract or transaction is approved or ratified, with knowledge of the director's interest, by a majority of the shareholders, or (c) the "contract or transaction be just and reasonable as to the corporation at the time it was authorized or approved."

We pass without discussion the possible application of subdivision (a) and subdivision (b) of section 311 to the compromise here, because we conclude that the trial court's approval of it must be upheld under subdivision (c) on the ground that it was just and reasonable as to the corporation.

An officer who renders beneficial service to a corporation, without any lawful action of the board of directors fixing his compensation, but under circumstances negativing an intent that they were to be gratuitous, may recover the reasonable value of those services. (*Bassett* v. *Fairchild* (1901), 132 Cal. 637 [64 P. 1082, 52 L.R.A. 611]; *King* v. *Grass Valley Gold Mines Co.* (1928), 205 Cal. 698, 699 [272 P. 290].) Here it is clear that the services were not intended to be gratuitous. The appellant contends that the Fielders both waived any compensation in excess of what they had already received, but we find nothing requiring such a conclusion. It is true the books of the association showed no claim for further compensation and it does not appear that they made any express protest against the amount received, but neither of these would necessarily effect a waiver. It does not appear that any of the payments were tendered or received as full payment.

If the payment to Mr. Fielder on the compromise, when added to what he had already received for the services covered by the compromise, resulted in his receiving no more than the reasonable value of those services, the compromise must be regarded as just and reasonable. The question what is the reasonable value of services is one of fact, and the decision of the trial court upon it is binding here, even though we might be disposed to exercise a different judgment upon

the evidence, unless we can say that upon no possible reasonable view of the evidence and the inferences to be drawn therefrom can the trial court's decision be supported. On rehearing we have carefully examined the transcript of the evidence, with special attention to the portions of it cited by the parties, and have concluded that we cannot say there is not sufficient support in it for the trial court's decision. Regarding his services Mr. Fielder testified: "Q. Mr. Fielder, indicating the year 1939 as an example, will you tell the Court what services you rendered to the company during that time—that is, the services you rendered from day to day; what you did. A. It was almost impossible. My work would be principally in promoting, getting agents, settling death claims. In 1939, conditions were bad. The agents—it had been nosed around that we were going to transform from Chapter 8 to a Chapter 9, and everybody we approached to get to represent us would say, 'Oh, I will wait until you get your transformation and a new contract.' And there has been quite a lot of money and time, during the time we made application for transformation up to August of last year. So, the last year we were not in a position to write any new business, and I devoted all my time to trying to conserve the business that was on the books, or had failed to make their monthly payments, to come back and get them on. Q. During 1939 do you recall how much new business was written by the Company? A. Very little. . . . Q. How much of your time did you spend on this new business—roughly? A. Oh, I wouldn't write any—I wasn't writing anything myself. Most of that time I would go out, go to the records and get a list of people that did not pay in this month, and go out and see what the trouble was. Q. You did not spend any time on the new business, then? A. No, I didn't. . . . Q. About how many lapsed members did you contact during the month? A. I couldn't tell you that. Q. Well, just give us an idea, roughly. A. I don't—I cannot give you an estimate of that because I never kept track of it. It is according to how long I talked to each member." He further testified that in 1939 the association "got out quite a bunch of policy forms," copying forms of another company, and that he "sat in on it," that he looked over all business correspondence, and "used to go out and investigate" applications for membership himself. He further testified: "Q. How much time did you spend in the office? A. Oh, I don't know. Hard to tell. I never

had to report to anyone but myself. Q. Were you there every day? A. In the office every day? If I was in town I was, yes. Q. Well, how often were you in town, then? A. You know, I could have saved myself a lot of trouble if I had known I was going to be asked these questions, and kept a diary. Q. I just wanted an approximation, not an exact computation of the number of days you spent in the office in 1939. I want to know about how many days you were in the office? A. Some weeks more than others. Q. Is that the closest you can tell us the amount of time you spent in the office? A. Yes. I never took any record. I didn't punch any clock. . . . Q. Were your duties prior to the year 1939 and subsequent to September, 1935, substantially the same as they were in 1939? A. Very much the same. It was getting tough right after 1935 in September, after Judge Caminetti had ordered the Association turned back to the directors. We lost half our members, and there was a tremendous lot of unpaid death claims. And it kept us busy, I'll tell you. They had passed a law which went into effect the coming year that we had to have our claims paid or else sufficient money on hand to equal our largest outstanding claims, and so forth, and so on. Pretty strenuous.'' Some other matters appear that seem of small consequence, but probably helped to fill in the details of the picture for the trial court, which was that Mr. Fielder had active supervision of the general affairs of the company. The total compensation received by him for the period covered by the compromise, including the compromise payment, amounted to only $294.45 per month. ▮ There was no direct evidence of the reasonable value of Mr. Fielder's services; but where the character and extent of the services rendered are shown, and they are such services as are within common knowledge, the trial court or jury may fix the value of the services without any expert testimony on that point. (*Nylund* v. *Madsen* (1928), 94 Cal.App. 441, 448 [271 P. 374]; *Spellmire* v. *Buttress & McClellan, Ltd.* (1935), 6 Cal.App. 2d 550 [44 P.2d 649]; *Kimes* v. *Davidson Inv. Co.* (1929), 101 Cal.App. 382, 387 [281 P. 639]; *Lundberg* v. *Katz* (1941), 44 Cal.App.2d 38, 46 [111 P.2d 917].) Here the services were of such character as to come within this rule, and while the evidence as to the extent of the services is somewhat meager and not as detailed as could be wished, yet it did present a picture of Mr. Fielder's activities. It would obviously

be impossible for one in his position to give, several years later, a detailed account of all his activities in behalf of the corporation. The trial court accepted this evidence as sufficient, and we think we would be going beyond the scope of appellate review if we reversed its decision in that respect.

Finally, section 1012 of the Insurance Code, requires that before an order such as that here appealed from can be made it shall appear that the insurer "can properly resume title and possession of its property and the conduct of its business." On this issue, also, the respondent had the burden of proof, and appellant insists that there is no evidence justifying a finding in respondent's favor thereon. This is a matter primarily for the consideration and discretion of the trial court, whose decision is binding on appeal unless without any support in the evidence. (*Caminetti* v. *Guaranty Union L. Ins. Co., supra* (1942), 52 Cal.App.2d 330, 336 [126 P.2d 159]; *Caminetti* v. *Imperial Mut. L. Ins. Co., supra* (1943), 59 Cal.App.2d 476, 486 [139 P.2d 681].) While there is evidence here which would have supported a finding against the respondent on this issue, we cannot say there is no reasonable view of the evidence which would support the trial court's implied finding in its favor.

The judgment appealed from is affirmed.

Shinn, Acting P. J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 13, 1944.