[Civ. No. 10917. Third Dist. Sept. 16, 1965.]

NELSON R. WILSON, Plaintiff and Respondent, v. RED BLUFF DAILY NEWS, Defendant and Appellant.

Stanley Pugh, Francis T. Cornish, Richard J. Asbill, Daniel S. Carlton and Carlton & Asbill for Defendant and Appellant.

Husted, Pinney, Smith & Ogg, W. M. Pinney, Jr., and William R. Conklin for Plaintiff and Respondent.

FRIEDMAN, J.—In the trial court plaintiff contended successfully that the defendant corporation owed him back salary as its vice-president, the salary being $150 per week for 196 weeks extending from August 1959 through May 1963. Defendant appeals from the judgment.

In April 1950 plaintiff Nelson R. Wilson entered the employment of the Red Bluff Daily News as its managing editor. Marion S. Walker was editor and publisher of the paper. In 1953 Wilson purchased a 23 per cent interest in the paper and became a partner with Walker, who owned a 67 per cent interest, and Opal Tucker, the business manager, who owned a 10 per cent interest. In 1955 the partners incorporated the business and the three partners became the board of directors. Walker, Wilson and Mrs. Tucker continued to perform the same functions in the operation of the paper as they had in the era preceding incorporation. At the board's first meeting in July 1956 Walker was elected president, plaintiff, the vice-president, and Mrs. Tucker the secretary-treasurer. ▮▮▮ A directors' meeting was held on January 15, 1957, and at the suggestion of Walker, the chairman, a resolution was adopted which, as stated in the minutes, provided as follows:

"The chairman suggested that the salaries of the officers of the corporation should be fixed by the directors at this meeting. On motion duly made, seconded and unanimously carried, said salaries were fixed as follows:

Marion S. Walker, President..........$200.00 per week
Nelson R. Wilson, Vice President.....$150.00 per week
Opal M. Tucker, Secretary-Treasurer..$150.00 per week

"It was also agreed that until otherwise determined by the Board said salaries were to constitute the compensation of said officers for all services rendered by them to the corporation."

Before the adoption of this resolution Walker's salary as editor-publisher had been $200 per week, Wilson's as managing editor $150 per week, and Opal Tucker's as business manager $150 per week. After the directors' meeting of January 15, 1957, each of these persons continued to perform the same duties as before and to receive the same compensation as before. There was no conversation at the meeting or afterward indicating that anyone was being paid for anything other than services actually rendered. Wilson's vice-presidential position did not require him to perform any services. According

to the corporate by-laws the only function of the vice-president was to act as president in the event of the absence or disability of the elected president.

Internal troubles arose. On August 19, 1959, Walker terminated Wilson's employment as managing editor. Wilson then wrote Walker a letter stating that he considered the termination to be ineffective and that he remained ready to resume his duties. In the latter part of that month Wilson accepted a salaried position in the employ of a newspaper in a neighboring community. On September 10, 1959, the shareholders of the Red Bluff Daily News held a meeting at which Wilson was removed from the office of director. At that time there was no formal action to remove him from the office of vice-president. In March 1963 he filed the present lawsuit. Shortly thereafter, on May 22, 1963, the directors of the Red Bluff Daily News held a meeting which formally terminated Wilson's status as vice-president. The salary awarded him by the trial court covered the period extending from August 19, 1959, when he was dismissed, through May 22, 1963, when his status as vice-president was terminated.

The key findings of the trial court are that the directors of the corporation voted Wilson a $150 weekly salary "as vice-president for all services rendered by him to the said corporation"; that he remained vice-president until May 22, 1963; that from August 19, 1959, to May 22, 1963, Wilson was not offered any work although he had notified the corporation of his readiness and ability; that the corporation had failed to pay Wilson his salary "as vice-president." On appeal the corporation contends that there was no evidence to support the trial court's finding that he was to be paid "as" or "for services as" vice-president, and alternatively, that the trial court erred as a matter of law in interpreting the resolution of January 15, 1957. A secondary problem is raised by the assertion that the appropriate measure of damages requires the award to be diminished by the amount which plaintiff earned in other employment during the period in question.

■ There is no evidence that Wilson's employment as managing editor was characterized by any specification as to tenure or term. Thus the relationship by which Wilson performed the salaried services of managing editor was terminable at will. (Lab. Code, §§ 2922, 3001.) ■ In the case of an "at will contract" the employer may discharge the employee at any time, with or without cause. (*Marin* v. *Jacuzzi*, 224 Cal.App.2d 549, 553 [36 Cal.Rptr. 880].) There is no serious dispute but that Walker's position as president of the cor-

poration and editor and publisher of the paper carried with it the general power to manage and superintend the business, including the power to dismiss the managing editor. (See *Memorial Hospital Assn.* v. *Pacific Grape etc. Co.,* 45 Cal.2d 634, 637 [290 P.2d 481, 50 A.L.R.2d 442].) Consequently Wilson's right to recover salary following his dismissal as managing editor depends solely on the meaning and effect of the action taken by the corporate directors at their meeting of January 15, 1957.

Wilson urges that the corporation was "bound" by its salary-fixing resolution of January 15, 1957, citing *Smith* v. *Woodville Consol. Silver Min. Co.,* 66 Cal. 398 [5 P. 688], and 13 California Jurisprudence, Second Edition, section 328, page 98. No doubt it was. The contention begs the question, which is—to what did the resolution bind the corporation? It is similarly pointless to suggest that the corporation and its directors are now estopped to question their own action. Such a suggestion assumes that the nature and effect of the action have been previously identified. Such identification is the first problem.

Essentially, plaintiff is contending that the resolution, as reflected in the corporate minutes, is a contractual commitment to pay salary to persons holding a title or status, regardless of the performance or nonperformance of services in the corporate enterprise. The contention rests on a strenuous adhesion to the symbolism of fixed language, eschewing all inquiry into the parties' intent. Seldom does a piece of litigation so resoundingly demonstrate that "the letter killeth, but the spirit giveth life." Whether the resolution is clear or ambiguous, it is not to be pursued at the cost of ignoring the unmistakable intention of the parties.

Let us assume that the resolution, as recorded in the minutes, "clearly" says what plaintiff contends it does. ▮ Whether a corporate officer is entitled to compensation depends on the intention of the parties. (*Caminetti* v. *Prudence etc. Ins. Assn.,* 62 Cal.App.2d 945, 951 [146 P.2d 15]; 5 Fletcher, Cyc. Corp., § 2111 (perm. ed. rev. repl. 1952).) The parties may manifest their intention in any of the usual ways, that is, by formal contract, by resolution or simply by their actions. ▮ When they do so by resolution, the resolution is not itself a contract but only evidence of it. (5 Fletcher, Cyc. Corp., § 2163 (perm. ed. rev. repl. 1952).) Consistently with these concepts, California cases hold that the parol evidence rule does not apply to corporate minutes; that the minutes are simply the written records of the events of a meeting; that

the record may or may not be true; and, in the absence of estoppel, the corporation or anyone else may show what took place at the meeting. (*Lawrence* v. *Premier Indem. Assur. Co.,* 180 Cal. 688, 698 [182 P. 431]; *Boone* v. *Hall,* 100 Cal. App.2d 738, 742 [224 P.2d 881].)

In this case the oral evidence is devoid of all except insignificant conflict. The testimony overwhelmingly establishes that the corporate directors, as they sat in their meeting of January 15, 1957, did not intend to make the slightest change in the preexisting salary arrangements, that their sole intent was to make these salaries a matter of corporate record. There is little or no evidence of any affirmative reason for the adoption of the resolution, although the trial court's opinion suggests the possibility that the resolution was adopted for tax purposes. Apparently, it was adopted at the suggestion of Marion Walker. According to Walker's testimony, the substance of the conversation at the meeting was that the parties would continue to do the same work at the same pay, that nothing was said about any services to be performed by the parties in their capacities as corporate officers, that in fact Wilson performed no duties "as" vice-president. Mrs. Tucker's testimony was similar. Wilson testified that he received a salary of $150 weekly before and after the meeting and that his salary remained the same up to the very end of his connection with the paper. At one point Wilson admitted that the services for which he received a salary were the services he performed "as" managing editor. At another point he claimed that following the adoption of the resolution he was being paid "as vice-president." These variant claims by Wilson create only an insignificant conflict, since in either event they are only argumentative or conclusionary interpretations on the part of the witness.

There is no occasion for estopping the corporation and its directors from going behind the face of the minutes, since the evidence demonstrates that Wilson suffered no change of position in reliance on the resolution. He performed the same work for the same pay before and after the resolution.

It would be erroneous to assume a lack of all ambiguity in the resolution. It involves three notions—salary, official status and services. It not only refers to the salary recipients as those holding designated titles, but says that these salaries are to constitute compensation "for all services . . . to the corporation." On its face, the resolution couples the notion of salary not only with official title but with ser-

vices as well. Plaintiff would exclude services as a condition of the salary-fixing action, even though services appear on the face of the resolution. So to exclude an expressed condition creates an ambiguity, that is, a state of doubt or uncertainty as to whether the expressed condition is a necessary and vital condition. At that point extrinsic evidence is admissible to discover the parties' real intent. (*Neff* v. *Ernst*, 48 Cal.2d 628, 635 [311 P.2d 849]; *Estate of Black*, 211 Cal. App.2d 75, 85 [27 Cal.Rptr. 418].) ▮ Interpretation of a written document is a matter of law. ▮ An appellate court is not bound by a trial court interpretation which is based solely on the terms of the document without the aid of evidence or where there is no conflict in the evidence. (*Parsons* v *Bristol Development Co.*, 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825].)

▮ The evidence of intent is all on one side. It demonstrates that plaintiff is capitalizing on clumsy and inept language of laymen in order to secure a windfall outside the expectations of the parties at the time they acted. The corporate titles were *descriptio personae*, not a designation of a capacity or status for which salary was to be paid. Each of these parties had one job and a number of titles. Walker was corporate president, corporate director, publisher and editor. Wilson was corporate vice-president, corporate director and managing editor. Mrs. Tucker was corporate secretary- treasurer, corporate director and business manager. No inference is possible other than the inference that they intended the salaries to be paid for the job each was performing in the conduct of the corporation's business, that is, in publishing a newspaper. After Wilson's job was lawfully terminated, he was no longer entitled to salary even though his title and status ''as vice-president'' continued.

Thus, whether the recorded resolution is plain or ambiguous, the contract was that intended by the parties—to pay salary in return for work and not as an honorarium to status holders. In view of this conclusion, the question of damages is moot.

The judgment is reversed and the cause remanded to the trial court with directions to enter judgment for the defendant with costs.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied October 13, 1965, and respondent's petition for a hearing by the Supreme Court was denied November 10, 1965.