MATTHEW V. BYRNE AND ELVIRA C. BYRNE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

GORDON P. SCHOPFER AND RHONDA F. SCHOPFER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3315-74, 3316-74.   Filed December 3, 1975.

*John J. Costello* and *Matthew V. Byrne,* for the petitioners.
*John D. Steele, Jr.,* for the respondent.

474

OPINION

Under section 167, a taxpayer is permitted to compute depreciation on tangible property by the declining balance method, using a rate not exceeding twice the straight line rate. For used section 1250 property acquired after July 24, 1969, however, this privilege is rescinded by section 167(j)(4).[3] Petitioners do not deny that the building in question was used

---

[3] SEC. 167. DEPRECIATION.
(j) SPECIAL RULES FOR SECTION 1250 PROPERTY.—
    * * *
    (4) USED SECTION 1250 PROPERTY.—Except as provided [for residential rental property] * * *, in the case of section 1250 property acquired after July 24, 1969, the original use of which does not commence with the taxpayer, the allowance for depreciation under this section shall be limited to an amount computed under—
        (A) the straight line method, or
        (B) any other method determined by the Secretary or his delegate to result in a reasonable allowance under subsection (a), not including—
            (i) any declining balance method, * * *
Sec. 1.167(j)-1(a)(2)(i), Income Tax Regs., provides:
The term "section 1250 property" means any real property * * * which is or has been property of a character subject to the allowance for depreciation provided in section 167 * * *

section 1250 property acquired after July 24, 1969. They claim relief under section 167(j)(6)(C), which provides:

Paragraphs (4) and (5) shall not apply in the case of section 1250 property acquired after July 24, 1969, pursuant to a written contract for the acquisition of such property * * *, which was, on July 24, 1969, and at all times thereafter, binding on the taxpayer.

Their position is that the June 6, 1969, letter from Byrne to the Schopfers, together with the record of the June 23, 1969, meeting, constitutes a binding written contract within the meaning of the statute.

Respondent has promulgated regulations which elaborate on the statutory language. With respect to the binding written contract requirement for used section 1250 property, sec. 1.167(j)-7(c), Income Tax Regs., incorporates the requirements imposed on contracts for the construction of new property by section 1.167(j)-4(b). With interpolations appropriate to this case, the pertinent part of those requirements is as follows:

(2) *Type of contract.* (i) A contract for the [acquisition] of property will qualify under this paragraph only if—

(*a*) The [acquisition] of such property is the subject matter of the contract,

(*b*) The contract provides that the property is to be [acquired] by or for the taxpayer * * *,
* * *

(*d*) The parties to the contract are the taxpayer * * *, and the person who is to [transfer property to] the taxpayer, or

(*e*) The parties to the contract are the taxpayer * * *, and the person with whom or for whom the taxpayer agrees to [acquire] property.
* * *

(3) *Legal formality.* (i) An agreement shall be considered as a contract binding on the taxpayer, for purposes of this paragraph, only if such agreement is in writing, constitutes a contract under applicable State or local law, and is enforceable against the taxpayer under such law. A contract which does not represent a bona fide agreement negotiated at arm's length shall not be considered a binding contract under this paragraph. * * *

Initially, we reject respondent's argument that, because Warron was not in existence on July 24, 1969, there could have been no written contract which was binding on the "taxpayer" on that date. Aside from the question whether the partnership or the partner is the taxpayer, section 1.167(j)-7(a)(3)(ii)(*f*) of the regulations provides that property (or rights in property) which is transferred in exchange for partnership interests and which would have qualified in the hands of the partners qualifies in the hands of the partnership. That section is applicable here. The

written partnership agreement provides both for the allocation of partnership interests and the transfer of the building to the partnership; the conclusion is inescapable that those interests were acquired in exchange for the interests of the partners in the building. Thus, we are only required to determine whether the building would have qualified for accelerated depreciation in the hands of the shareholders of Limited if they had continued to hold it after the liquidation.

We therefore turn to an analysis of the instant situation in light of the applicable statute and regulations. Petitioners make a highly legalistic argument asserting that the written documentation, consisting of the June 6, 1969, letter and the memorandum of the meeting held on June 24, 1969 (which petitioners contend constitute minutes of a stockholders meeting), satisfies the requirements of an "agreement in writing" which "constitutes a contract under applicable State or local law and is enforceable against the taxpayer under such law." See sec. 1.167(j)-4(b)(3), Income Tax Regs., *supra.*

There are several flaws in petitioners' position. First, it is debatable whether the memorandum of June 24 constitutes minutes of a stockholders meeting. The document is on the stationery of a law office, it is not signed by anyone, the name of the person who prepared the memorandum is Matthew V. Byrne, Jr., who was the president and not the secretary of the corporation (the latter usually being the officer of a corporation charged with the preparation of minutes and the custody of the minutes book),[4] and neither Byrne's designation as president nor the status of the other individuals as stockholders is reflected on the document. However, we need not rest our decision on this equally technical ground. Even if we assume that the memorandum can be characterized as stockholders' minutes, we do not believe that it constitutes a written agreement. Thus it has been observed, in connection with the application of the parol evidence rule: "*minutes of a meeting are not a written instrument.* Their function is merely to act as a written record of what took place at the meeting." (Emphasis supplied.) See *Lawrence v. Premier*

---

[4] The bylaws of the corporation were not submitted in evidence. We also note that at least one New York court has stated that it is not necessary, as a matter of law, that minutes be kept by a private corporation or that any such minutes be signed by any officer. See *Woodhaven Bank v. Brooklyn Hills Imp. Co.,* 69 App. Div. 489, 74 N.Y.S. 1023 (2d Dept. 1902). But, in the context of this case, we think the omission has some significance, albeit peripheral.

*Indemnity Assur. Co.,* 180 Cal. 688, 182 P. 431, 435 (1919). Or to put it another way:

The parties may manifest their intention in any of the usual ways, that is, by formal contract, by resolution or simply by their actions. When they do so by resolution, *the resolution is not itself a contract* but only evidence of it. [Emphasis supplied.]

See *Wilson v. Red Bluff Daily News,* 237 Cal. App. 2d 87, 46 Cal. Rptr. 591, 594 (3d Dist. Ct. App. 1965). Thus, reliance on section 624(g) of the New York Business Corporation Law [5] is misplaced. That section simply sets forth a rule of evidence and does not, by itself, equate the minutes with a written agreement. Perhaps the memorandum sets forth an arrangement which, in the proper context, could be enforced by the individuals against each other or against any of the individuals who sought to disavow the plan to liquidate Limited. But enforceability is only one element and comes into play after a "written contract" as required by the statute (see sec. 167(j)(6)(C)) is found to exist.

Beyond the foregoing, there are additional flaws. Thus, the statute requires that the contract be "for the acquisition of such [sec. 1250] property." We think that this requirement is not satisfied. At best, the so-called "minutes" of June 24 simply call for a liquidation of Limited and not a liquidation in kind. We think that if three of the four stockholders (who held 75 percent of the voting stock) had subsequently decided to have Limited sell the property and then distribute the cash in liquidation, they could have done so despite the objection of the fourth stockholder.[6] In our opinion, the letter of June 6, 1969, which indicates that a liquidation in kind was contemplated cannot be said to supply the necessary ingredient to conclude that there was an enforceable agreement to liquidate Limited in kind.

Moreover, we think it clear that petitioners have not satisfied the requirement of the regulations that a contract, to be binding for the purpose of section 167(j)(6)(C) must represent "a bona fide agreement negotiated at arm's length." See sec. 1.167(j)-4(b)(3)(i), Income Tax Regs. It cannot be denied that, on the

---

[5] (g) The books and records specified in paragraph (a) [which include minutes of shareholders meetings] shall be prima facie evidence of the facts therein stated in favor of the plaintiff in any action or special proceeding against such corporation or any of its officers, directors or shareholders.

[6] Since the certificate of incorporation contains no contrary provision, a vote of two-thirds of the shareholders would appear sufficient. See sec. 909, N.Y. Bus. Corp. Law; Fletcher Cyclopedia Corporations, secs. 2949.2, 2949.3, 2949.6 (perm. ed. 1968).

record before us, the only purpose for the liquidation of Limited was the perceived tax advantage of accelerated depreciation of the property in the hands of the partnership. While the presence of a tax-avoidance purpose is not, in and of itself, perfidious if the transaction involved has substance, it is clearly an element which can be taken into account. See *George L. Schultz,* 50 T.C. 688, 694 (1968), affd. per curiam 420 F. 2d 490 (3d Cir. 1970). Petitioners were not obligated to pay and in fact did not pay for the property. In the foregoing context, the apparent exclusivity of tax purpose is significant, particularly when one takes into account the purpose which motivated the Congress to enact section 167(j).[7]

In light of such announced purpose, one is led inexorably to the conclusion that the type of arrangement involved herein, even assuming that it achieved the status of a "written contract," is not the kind of "written contract" Congress had in mind when it carved out the exception contained in section 167(j)(6)(C). We have also taken into account the fact that we are dealing herein with a special statutory exemption which has the effect of allowing a deduction and that, since deductions are a matter of legislative grace, such a provision should be narrowly construed. See *Commissioner v. Nat. Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149 (1974). Clearly, the arrangement involved herein is not one which falls within the ordinary meaning of the quoted phrase.[8] Compare *Bingler v. Johnson,* 394 U.S. 741, 749-751 (1969), with *Commissioner v. Brown,* 380 U.S. 563, 570-571

---

[7] "As a result of the fast depreciation, the ability to deduct amounts in excess of the taxpayer's equity, and section 1231 treatment on the sale of the property, economically profitable real estate operations normally produce substantial tax losses, sheltering from income tax the economic profit of the operation and permitting avoidance of income tax on the owner's other ordinary income, such as salary and dividends. Later, the property can be sold and the excess of the sale price over the remaining basis is treated as a section 1231 gain except for the limitations in section 1250."

See H. Rept. No. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 303; S. Rept. No. 91-552 (1969), 1969-3 C.B. 423, 557.

[8] We note that when Congress enacted Pub. L. 91-675 in 1971, enlarging, with carefully circumscribed limitations, the exemptions from the application of sec. 311(d), both the House Ways and Means Committee and the Senate Finance Committee stated:

"A substantially similar type of case has arisen, where corporations have, in fact, begun plans of redemption pursuant to boards of directors resolutions adopted before the congressional consideration of the provision and where a substantial part of the plans had been carried out before the date of enactment of the 1969 act. The type of situation referred to is not within the transitional rules of the 1969 act, however, because it does not involve a binding contract, public offer, or description filed with a public agency. * * *"

See H. Rept. No. 91-1694 (1970), p. 2; S. Rept. No. 91-1542 (1970), 1971-1 C.B. 600, 600-601.

(1965). In *Hercules Gasoline Co. v. Commissioner,* 326 U.S. 425 (1945), the Supreme Court was called upon to interpret section 26(c) of the Revenue Act of 1936, which provided a credit against income in the computation of the undistributed profits surtax of—

An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating *a provision of a written contract* executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. [Emphasis supplied.]

The Court held that the credit did not apply to a prohibition imposed by the corporate charter on the payment of dividends on common stock prior to the retirement of the outstanding preferred. It followed the holding of *Helvering v. Northwest Steel Mills,* 311 U.S. 46 (1940), that Congress intended the credit to be "limited to contracts involving ordinary obligations to creditors." 326 U.S. at 429.[9] The Court noted that a contrary holding would permit the corporation by self-dealing to avoid the imposition of the tax. We believe a similar rationale applies here and that an arrangement for liquidation among a corporation and its shareholders is not entitled to the benefits of the exception contained in section 167(j)(6)(C).

To reflect the parties' agreement on other issues,

*Decisions will be entered under Rule 155.*

---

[9] In reaching its conclusion in *Northwest Steel,* the Court stated (311 U.S. at 49):

"The natural impression conveyed by the words 'written contract executed by the corporation' is that an explicit understanding has been reached, reduced to writing, signed and delivered. True, obligations not set out at length in a written contract may be incorporated by specific reference, or even by implication. But Congress indicated that any exempted prohibition against dividend payments must be expressly written in the executed contract. It did this by adding a precautionary clause that the granted credit can only result from a provision which 'expressly deals with the payment of dividends.'"