[L.A. No. 30729. Dec. 9, 1977.]

GERALD A. EZEKIAL, JR., Plaintiff and Appellant, v.
JOHN WINKLEY et al., Defendants and Respondents.

■■■■■■■■■■

**COUNSEL**

Mink & Alpert and Michael S. Mink for Plaintiff and Appellant.

Thelen, Marrin, Johnson & Bridges, James W. Baldwin and Curtis A. Cole for Defendants and Respondents.

Musick, Peeler & Garrett and Joseph A. Saunders as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**RICHARDSON, J.—** ■■■ In this case we consider whether a surgical resident in a private teaching hospital must be accorded notice of charges

and an opportunity to respond, pursuant to the "common law right of fair procedure" (*Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 [116 Cal.Rptr. 245, 526 P.2d 253] (*Pinsker II*)), prior to dismissal from the residency program. We conclude that "fair procedure" principles are applicable to the facts pleaded herein. We therefore reverse the judgment of dismissal and remand with directions to overrule the demurrer to the first and second causes of action of the third amended complaint.

In part, the third amended complaint alleges the following: Plaintiff is a physician licensed to practice in California. Defendants Kaiser Foundation Health Plan, a nonprofit corporation, and Southern California Permanente Medical Group (Group), a partnership, operate Kaiser Foundation Hospital (Kaiser), a nonprofit corporation, in Los Angeles. Defendant Winkley is Kaiser's chief of surgery and a partner in Group, and defendant Rieder is Kaiser's administrator. In 1972, Winkley sought out plaintiff, who was then engaged in a general medical practice in San Diego, and invited him to join the surgical residency program at Kaiser, orally promising him that he would be employed for the three remaining years necessary to complete his residency. Plaintiff had previously completed his first year of surgical residency in a San Diego hospital. Plaintiff also examined Kaiser's brochures which described a surgical residency at Kaiser as a four-year program. In reliance on these representations, plaintiff accepted the offer of residency, closed his San Diego practice, sold his home, and moved with his family to Los Angeles.

According to further allegations of the complaint, plaintiff, in the status of a second-year resident, began work at Kaiser on December 4, 1972, under the terms of a letter agreement which covered his first year at Kaiser. On the first anniversary of his employment, he was orally rehired for one additional year, which terminated December 3, 1974. However, in January 1974, Winkley advised plaintiff that he would not be permitted to remain in the Kaiser surgical residency program after June 30, 1974. No reasons were given to plaintiff, either then or subsequently, for Kaiser's decision to dismiss him. No notice of charges was given, and plaintiff was afforded neither a hearing nor opportunity to respond prior to termination. Dismissal from Kaiser will, as a practical matter and because of Kaiser's close relationship with other teaching hospitals, prevent plaintiff's acceptance in any other surgical residency program. Successful completion of an approved surgical residency is a prerequisite to attainment of the status of a "board certified general surgeon,"

without which plaintiff cannot practice a surgical specialty in any accredited California hospital.

After the filing of plaintiff's verified complaint for damages and injunctive relief, the trial court issued a temporary restraining order prohibiting plaintiff's discharge pending resolution of his request for a preliminary injunction. The trial court conducted an adversary hearing and then dissolved the restraining order and denied any injunctive relief. Kaiser thereupon dismissed plaintiff. Subsequently, defendants' demurrer to plaintiff's third amended complaint (the complaint) was sustained without leave to amend, and plaintiff appeals from the subsequent judgment of dismissal.

Plaintiff contends that the circumstances of his dismissal do not comport with common law rights of "fair procedure," the origins of which can be traced to our opinion in *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 731 [155 P.2d 329, 160 A.L.R. 900]. In *Marinship,* we held that a labor union, because of its ability to exclude all nonmembers from employment in a particular trade, assumed legal responsibilities beyond those which were applicable to other private organizations such as social clubs. We concluded that the union's possession of this power entitled applicants for membership, under the common law, to judicial protection against arbitrary exclusion on the basis of race. (*Ibid.*) Since *Marinship,* California courts, in a variety of circumstances, have recognized the effect which exclusion from membership in a private organization exerts upon a person's right to pursue a particular profession or calling. Thus, subsequent California decisions have not only expanded judicial review of labor union membership policies (e.g., *Directors Guild of America, Inc.* v. *Superior Court* (1966) 64 Cal.2d 42, 44 [48 Cal.Rptr. 710, 409 P.2d 934]; *Thorman* v. *Intl. Alliance etc. Employees* (1958) 49 Cal.2d 629, 634 [320 P.2d 494], overruled on other grounds, *Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 721, fn. 8 [73 Cal.Rptr. 213, 447 P.2d 325]), but also have applied the *Marinship* principle to the admission practices of professional societies, membership in which is a practical prerequisite to pursuit of a medical or dental specialty (*Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 166 [81 Cal.Rptr. 623, 460 P.2d 495] (*Pinsker I*); *Kronen* v. *Pacific Coast Society of Orthodontists* (1965) 237 Cal.App.2d 289, 305 [46 Cal.Rptr. 808], cert. den. (1966) 384 U.S. 905 [16 L.Ed.2d 358, 86 S.Ct. 1340]), and to access by practicing physicians to staff privileges in private hospitals (*Ascherman* v. *Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507, 511-512 [119 Cal.Rptr. 507] (*Ascherman II*); *Ascherman*

v. *San Francisco Medical Society* (1974) 39 Cal.App.3d 623, 631 [114 Cal.Rptr. 681] (*Ascherman I*); see *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 468 [131 Cal.Rptr. 90, 551 P.2d 410]).

Exclusion from such groups has been deemed "arbitrary" when it is substantively unreasonable, internally irregular, or, as indicated in *Pinsker II, supra,* procedurally unfair. In *Pinsker II,* we explained that the common law right to a "fair procedure" includes "adequate notice of the 'charges' . . . and a reasonable opportunity to respond." (12 Cal.3d at p. 555.)

The underlying rationale of the *Marinship-Pinsker* line of cases is that certain private entities possess substantial power either to thwart an individual's pursuit of a lawful trade or profession, or to control the terms and conditions under which it is practiced. (See generally Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* (1967) 55 Cal.L.Rev. 1247, 1255.) Thus, in *Marinship, Directors Guild,* and *Thorman,* all *supra,* a labor union's arbitrary policies of exclusion had important effects on the employment opportunities of persons already qualified and employed in a craft or trade. In *Kronen,* and in the *Ascherman* and *Pinsker* cases, all *supra,* private organizations, by controlling access to vital professional privileges and certifications, had a similar practical ability to foreclose from practice one who had already obtained a professional license. We have said that the right to practice a lawful trade or profession is sufficiently "fundamental" to require substantial protection against arbitrary administrative interference, either by government (see, e.g., *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242]; *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 75 [64 Cal.Rptr. 785, 435 P.2d 553]) or by a private entity (see *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 823 [140 Cal.Rptr. 442, 567 P.2d 1162].)

The *Marinship-Pinsker* principles, invoked primarily against arbitrary *exclusions* from membership in private associations, have been rather narrowly applied to situations with substantial economic ramifications. Prior to *Marinship,* however, it was established that one may not be *expelled* from membership in a private association without charges, notice and hearing. ■ This common law protection against arbitrary expulsion, judicially declared, is of broader application and has been extended not only to labor unions (e.g., *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 143-144 [231 P.2d 6, 21 A.L.R.2d 1387]; *Otto* v. *Tailors' P. & B. Union* (1888) 75 Cal. 308, 314-315 [17 P. 217]; *Ellis* v.

*American Federation of Labor* (1941) 48 Cal.App.2d 440, 443-444 [120 P.2d 79]) and professional and trade organizations (e.g., *Smith v. Kern County Medical Assn.* (1942) 19 Cal.2d 263, 265 [120 P.2d 874]; *Cunningham v. Burbank Bd. of Realtors* (1968) 262 Cal.App.2d 211, 214 [68 Cal.Rptr. 653]; *Swital v. Real Estate Commissioner* (1953) 116 Cal.App.2d 677, 679 [254 P.2d 587]), but to mutual benefit societies (e.g., *Taboada v. Sociedad Espanola etc.* (1923) 191 Cal. 187, 191 [215 P. 673, 27 A.L.R. 1508]; *Von Arx v. San Francisco G. Verein* (1896) 113 Cal. 377, 379-380 [45 P. 685]) and other fraternal and social groups (e.g., *Supreme Lodge, etc. v. L. A. Lodge No. 386* (1917) 177 Cal. 132, 136 [169 P. 1040]). The underlying theme of these decisions, variously stated, is that membership in an association, with its associated privileges, once attained, is a valuable interest which cannot be arbitrarily withdrawn. Thus, they comport with the broader principle that one on whom an important benefit or privilege has already been conferred may enjoy legal protections not available to an initial applicant for the same benefit. (See, e.g., *Bixby v. Pierno, supra,* 4 Cal.3d at p. 146.)

We think that the essential ingredients of this and the foregoing cases are sufficiently comparable so that a similar rule should be invoked herein. In California, a licensed physician or dentist is legally and fully qualified to practice in the field encompassed within his license; the state imposes no additional legal requirements for practice of a medical or dental specialty. To ensure higher standards of competence and ethics, however, these professions have adopted extensive systems of post-license private regulation. Through professional society memberships, specialty certification requirements, and hospital admission policies, the professions can effectively control the individual licensee's practical ability to utilize the license conferred.

As was well expressed by the *Kronen* court, "It is common knowledge that in this day of specialization, the doctor or dentist limiting his practice to a specialty enjoys a prestigious position with attendant economic advantages. It appears to us on this record that as a practical matter, an orthodontist like plaintiff cannot successfully limit his practice to orthodontics unless he becomes an active member of defendant organizations. These are the realities of the situation." (237 Cal.App.2d at p. 304; see also *Pinsker I, supra,* 1 Cal.3d at p. 163.)

A hospital's staff membership decisions contain a similar potential for arbitrary impairment of the physician's right to engage in activities authorized by his license. "It is common knowledge that a

physician or surgeon who is not permitted to practice his profession in a hospital is as a practical matter denied the right to fully practice his profession . . . . [M]uch of what a physician or surgeon must do can only be performed in a hospital." (*Wyatt* v. *Tahoe Forest Hospital Dist.* (1959) 174 Cal.App.2d 709, 715 [345 P.2d 93]; see also *Rosner* v. *Eden Township Hospital Dist.* (1962) 58 Cal.2d 592, 598 [25 Cal.Rptr. 551, 375 P.2d 431].) While *Wyatt* and *Rosner* were concerned with the staff admission practices of *public* hospital districts, their rationale has been extended to private institutions (*Ascherman I, supra,* 39 Cal.App.3d at pp. 645-646) and has been approved by us in our discussion of the common law right of "fair procedure." (*Pinsker II, supra,* 12 Cal.3d at pp. 553-554.)

Our research has disclosed no case which has extended the common law doctrine of fair procedure to dismissals from a private hospital *residency.* We note, however, similar important indicia of practical control. Post-license residency training, like professional society membership and hospital staff membership, forms a vital link in the system of private regulation. Defendants concede the importance of residency training to the successful practice of modern medicine by acknowledging that most licensed physicians now seek residencies in one or more of the recognized medical specialties. The complaint further underscores the significance to plaintiff of a residency opportunity in its description of his willingness to undergo substantial professional sacrifice and career disruption in order to enter Kaiser's program.

Thus, plaintiff's complaint contains allegations similar in important respects to those in which common law protection has heretofore been recognized. He alleges that, despite his license, no accredited California hospital will permit him to use its facilities to perform surgery until he has achieved recognition as a "board certified general surgeon"; an absolute prerequisite to attainment of this necessary certification is completion of an approved residency program; though Kaiser does not operate the only such program, its relations with the limited number of other public and private teaching hospitals will prevent his acceptance in any other program once Kaiser has dismissed him.

In short, the complaint avers that, as to those licensed physicians undertaking its residency program, Kaiser has assumed the power to permit or prevent their practice of a surgical specialty and to thwart the enjoyment of the economic and professional benefits flowing therefrom. These are precisely the considerations to which the *Marinship-Pinsker* doctrine applies.

Furthermore, according to the complaint, Kaiser seeks to *expel* petitioner from a program to which he has already been accepted, and in which he has already been very substantially engaged. For this additional reason, we conclude that plaintiff is entitled to "fair procedure" protection prior to dismissal from the Kaiser residency program.

Defendants identify what they perceive as crucial distinctions in status between plaintiff as a medical resident and those independent practicing professionals involved in prior cases. Fundamentally, it is argued that common law rights of "fair procedure" apply neither to an employer-employee relationship, nor to the training opportunity by which a physician seeks to qualify as a medical specialist. Defendants urge that, unlike an independent physician with hospital staff privileges, plaintiff is merely an employee whose connection with the hospital is terminable at will in the absence of a contrary agreement, and whose only remedy is a claim for money damages for any contractual breach. (Lab. Code, § 2922; *Swaffield* v. *Universal Ecsco Corp.* (1969) 271 Cal.App.2d 147, 167 [76 Cal.Rptr. 680].) Such an economic relationship, it is suggested, creates no right to specific performance or injunctive relief (Civ. Code, §§ 3390, 3423, subd. Fifth; Code Civ. Proc., § 526, subd. 5), and gives rise to no "fair procedure" rights.

No case has yet applied the *Marinship* doctrine directly to a relationship dependent upon employment alone. (But see *Marinship, supra,* 25 Cal.2d at pp. 724-725 [injunction prohibiting employer from refusing, under closed shop contract, to hire or retain blacks who were ineligible for union membership].) Nor has the rule against arbitrary *expulsion* from a private association been invoked in the employment context. These common law principles were, of course, never intended to invoke legal sanctions, beyond those founded either on contract or statute, on behalf of every employee threatened with discharge by a private employer. Rather, *Marinship* and successive cases have emphasized that the membership privileges, or the professional recognition, which certain private institutions may arbitrarily grant, deny, or withdraw are practical prerequisites to *any* effective employment in a chosen field.

In the instant case we look beyond plaintiff's immediate status as an employee of Kaiser and examine an entirely distinct interest which also inheres in his residency, namely, his expectation of achieving necessary certification as a surgeon. We conclude that defendants may not defeat

application of *Marinship-Pinsker* principles on the basis alone that plaintiff, as a resident, is also necessarily an employee of the hospital.

Defendants point to what they consider to be a second crucial distinction between common law rights cases and the matter before us. Here, it is urged, plaintiff alleges no interference with the pursuit of a specialty or profession for which he is *already* qualified (see, e.g., *Pinsker I, supra,* 1 Cal.3d at p. 166; *Ascherman I, supra,* 39 Cal.App.3d at pp. 643-648; *Rosner* v. *Eden Township Hospital Dist., supra,* 58 Cal.2d at p. 598; *Wyatt* v. *Tahoe Forest Hospital Dist., supra,* 174 Cal.App.2d at p. 715), but seeks, rather, specialty preparation by which he may become so qualified.

Defendants express several reasons why the *Marinship-Pinsker* principles should not apply to those engaged in a training process. First, it is suggested, a medical resident knows in advance that his performance in the residency program is subject to continuing evaluation by his superiors, who must determine whether he is making satisfactory progress. Thus, unlike the professional who has already qualified, he has no "legitimate claim of entitlement" to his residency, or to eventual certification, but only a "unilateral expectation" that he will be successful. (Cf., *Board of Regents* v. *Roth* (1972) 408 U.S. 564, 577 [33 L.Ed.2d 548, 560-561, 92 S.Ct. 2701].) Closely related to this argument is the implication that "fair procedure" rights are not readily adaptable to a process of continuing evaluation and monitoring.

We recognize a distinction between the matter before us and prior decisions which have applied *Marinship.* Here, the private selection process has operated, not by rejection of a direct application for hospital staff membership, specialty certification, or professional society membership, but at an earlier point in the physician's progress toward specialty status. For several reasons, we do not find the distinction significant under the circumstances herein present.

■ First, as we have noted, plaintiff has already obtained his license to practice medicine. While this fact alone by no means establishes his actual competence in a surgical specialty we think a license, *coupled with his acceptance into a post-license residency program,* entitles the physician to some legal protection of his expectation that the requirements for full utilization of the medical license will be met through his attainment of specialty status. (Cf., *Stretten* v. *Wadsworth Veterans Hospital* (9th Cir.

1976) 537 F.2d 361, 367-368.) Under such circumstances, the essential elements for application of the *Marinship-Pinsker* rule are satisfied.

Second, there is no reason why the fact of a continuing scrutiny of a physician's competence and progress in a residency program should bar application of "fair procedure" principles. Such evaluations inhere in all standards by which initial or continuing eligibility for professional privileges and benefits is measured, and courts have shown no reluctance to expand both administrative and judicial review of institutional decisions of this kind. (See, e.g., *Anton* v. *San Antonio Community Hosp.,* *supra,* 19 Cal.3d at pp. 821-825; *Yakov* v. *Board of Medical Examiners,* *supra,* 68 Cal.2d at p. 72, fn. 3; *Kronen, supra,* 237 Cal.App.2d at pp. 305-307.)

■ Defendants argue that dismissal from a medical residency, unlike the exclusion from those membership and participating privileges and benefits which have characterized prior cases, does not result from the anticompetitive use of "monopoly" power by one's professional peers. Such overtones of self-interest and personal advantage, defendants urge, characterize the *Marinship* doctrine. (See, e.g., *Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806, 809-810 [26 Cal.Rptr. 640, 376 P.2d 568].) However, the application of the common law rule does not depend on the existence of "monopoly" power. (E.g., *Ascherman II, supra,* 45 Cal.App.3d at p. 511 [availability of other nearby hospitals no bar to claim for wrongful denial of staff privileges]; *Ascherman I, supra,* 39 Cal.App.3d at p. 650, fn. 9 [same].) The judicial inquiry, rather, has consistently been focused on the practical power of the entity in question to affect substantially an important economic interest. Plaintiff has alleged such power in the matter before us.

Finally, defendants find significance in the fact that they are civilly liable for any malpractice by plaintiff as a hospital employee, whereas they might not be responsible for the acts or omissions of independent physicians holding staff privileges. (*Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420, 435 [71 Cal.Rptr. 903, 445 P.2d 519]; *Mayers* v. *Litow* (1957) 154 Cal.App.2d 413, 418 [316 P.2d 351].) From the foregoing it is argued that defendants' interest in protecting themselves against the incompetency of residents is greater than in protecting against the mistakes or errors of staff physicians, thereby presumably creating a greater legitimate incentive to terminate summarily residents whose performance is marginal.

We are sensitive to the difficulty and danger, on the one hand, of any undue restrictions on the essential ability of a hospital to discipline its professional staff thereby controlling its professional performances, while, on the other hand, malpractice liability is imposed on the hospital for its failure to exercise such control. We emphasize, however, that defendants are not precluded from dismissing plaintiff for incompetence. We hold only that, in doing so, they must afford him rudimentary procedural and substantive fairness. Moreover, the hospital is, of course, not prevented from immediately suspending a resident with pay, or placing him on noncritical duties, pending a fair determination of his competence in the residency program. Such procedures, we think, offer the hospital a practical and adequate temporary means of protecting the health and safety of its patients. In the instant case, we further observe that the urgency of isolating plaintiff from the hospital's surgery schedule appears less than overwhelming, since, according to the complaint, he was given *six months'* notice of his dismissal.

For the foregoing reasons, we hold that plaintiff has stated a valid claim for wrongful denial of the common law right of "fair procedure" by alleging that such dismissal will effectively prevent his entry into the medical specialty for which his residency training was preparing him. We therefore conclude that the trial court erred in sustaining defendants' demurrer to plaintiff's first cause of action.

We briefly comment upon the nature of the "fair procedure" to be afforded plaintiff. In *Pinsker II,* we observed that it implied, at a minimum, "some meaningful opportunity [for the adversely affected individual] to be heard in his defense." However, we carefully refrained from requiring the "formal proceedings with all the embellishments of a court trial," nor did we attempt to fix any "rigid procedure that must invariably be observed." Rather, we placed initial responsibility on the affected institutions themselves to devise practical methods of "provid-[ing] an [adversely affected individual] . . . adequate notice of the 'charges' against him and a reasonable opportunity to respond." (12 Cal.3d at p. 555.)

In reaffirming the foregoing reasoning and conclusions, we recognize the practical limitations on the ability of private institutions to provide for the full airing of disputed factual issues. (See *Ascherman I, supra,* 39 Cal.App.3d at pp. 648-649; *Silver* v. *Castle Memorial Hospital* (1972) 53 Hawaii 475, 563 [497 P.2d 564, 571-572], cert. den., 409 U.S. 1048 [34 L.Ed.2d 500, 93 S.Ct. 517], rehg. den. (1973) 409 U.S. 1131 [35 L.Ed.2d

264, 93 S.Ct. 936].) It is equally true that expert supervisorial judgment as to a resident's competence must necessarily be accorded great weight. As in *Pinsker II, supra,* we reemphasize that whether the procedure is "fair" in a particular case depends largely on "the nature of the tendered issue," which determines, for example, whether a mere written response is adequate, or whether a personal appearance by the adversely affected individual and a more extensive hearing are required. (12 Cal.3d at pp. 555-556.)

The medical profession does not lack models from which the form of such "fair procedure" rights may be adapted. Plaintiff attaches to his complaint Guidelines for the Formulation of Medical Staff By-Laws, Rules and Regulations ((1971) Joint Com. on Accreditation of Hospitals), which provide for extensive hearings and internal appellate review in staff appointment and dismissal cases. (See art. VIII, § 1 et seq.) The record does not disclose whether Kaiser subscribes to these guidelines, but we are advised that they are widely accepted by both public and private hospitals. (See *Anton, supra,* 19 Cal.3d at pp. 818-819.) We are satisfied, therefore, that the extension of "fair procedure" rights to hospital residents will not impose insuperable administrative burdens on the affected institutions.

We note that plaintiff's complaint seeks reinstatement to his residency position pending Kaiser's compliance with "fair procedure." Since we decide herein only that plaintiff has stated a cause of action under the "fair procedure" doctrine, we deem it unnecessary to determine as a matter of law whether reinstatement, as a remedy, is available. The nature and extent of remedial action, if any, is left to the sound and informed discretion of the trial court, based upon the facts properly developed before it.

Finally, the validity of plaintiff's second cause of action, for contractual damages, was originally at issue on appeal. Defendants have clearly abandoned their opposition to the contractual claims before this court, however, and we therefore deem it unnecessary to address the issue.

The judgment of dismissal is reversed and we remand with directions to overrule the demurrer as to the first and second causes of action.

Bird, C. J., Tobriner, J., Clark, J., and Sullivan, J.,* concurred.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

**MOSK, J.**—I dissent.

I fear my learned colleagues in the majority are extending the amorphous common law right to "fair procedure" far beyond any previous contemplation. In so doing they create a cumbersome burden on employer-employee contractual relations, substitute judicial rather than professional determination of professional qualifications, and potentially affect the ability of medical institutions to provide the type of care they desire for their own patients.

In his third amended complaint, the plaintiff alleged three causes of action. In the first he sought injunctive relief; in the second, damages for breach of contract in the amount of $1.6 million; in the third, damages for intentional infliction of emotional distress in the amount of $2.5 million plus an additional $2.5 million for punitive damages. On this appeal we are concerned primarily with the prayer for injunctive relief "pending a specification of charges and the opportunity to respond to charges through a hearing."

## I

The majority accurately trace the origins of the common law right of fair procedure to *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]. But *Marinship* was based on circumstances in which a labor union had "attained a monopoly of the supply of labor" (*id.,* p. 731). When the alleged facts indicate monopoly control of services, Chief Justice Gibson declared in quoting from *Wilson* v. *Newspaper and Mail Deliverers' Union* (1938) 123 N.J.Eq. 347 [197 A. 720], "the holders of the monopoly must not exercise their power in an arbitrary, unreasonable manner so as to bring injury to others. The nature of the monopoly determines the nature of the duty. Everyone must be left free to pursue his lawful calling; that is fundamental . . . the union must either surrender its monopoly or else admit to membership all qualified persons" (*id.,* p. 732).

The reason for applying a common law doctrine to situations involving the equivalent of a restraint of trade was explicated by Chief Justice Gibson in *Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806 [26 Cal.Rptr. 640, 376 P.2d 568]. An osteopath excluded from the staffs of hospitals in his community sought damages under the Cartwright Act. This court held "the act was not intended to apply to the professions" but that nevertheless a common law action would lie when there was "a

conspiracy designed to restrain competition and deprive [plaintiff] of his practice in order to benefit competing members of the conspiracy" (*id.,* p. 810).

Forgoing repetitious analysis of cited cases, I can safely assert that in every authority relied upon by the majority there was an element of monopoly control of the professional practice involved. As recently as last year, Justice Tobriner emphasized for a unanimous court in *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 486 [131 Cal.Rptr. 90, 551 P.2d 410]: "Our past decisions demonstrate that this court has been adamant in its endeavor to eradicate monopolistic control of professional opportunities."

There is no monopoly of access to a profession or a conspiracy by competitors in this case. To the contrary, plaintiff alleges that defendants' residency program "is unique . . . unlike most private hospitals." The plaintiff has not been denied the right to practice medicine, nor has he been barred by competitors from access to the patients and facilities of the community. He has been thwarted in his subjective expectations of completing his residency in surgery at the hospital controlled by defendants. While he alleges he will be unable to obtain a surgery residency at any other accredited hospital in California, he does not describe how these defendants control or influence residency programs at any other institution.

Plaintiff's expectations were based on an alleged oral contract. If he can establish a contract and a breach thereof he may recover damages. But what the plaintiff seeks in actuality is specific performance of an employment contract. His hurdle is the statute which unequivocally prohibits specific performance of an agreement to render personal service or to employ another in personal service (Civ. Code, § 3390; also see Civ. Code, § 3423, subd. Fifth, and Code Civ. Proc., § 526).

To avoid the statutory bar, the plaintiff then seeks to bootstrap an alleged breach of an employment contract into an equitable proceeding, by adding claims of irreparable injury. Undoubtedly there are untoward detrital effects after every employment dismissal. But I doubt that the majority realize, in attempting to ameliorate that result by approving plaintiff's theory, they are establishing precedent for requiring employers to provide a "fair hearing" to every employee who alleges a subjective expectancy of continued employment and injury for having

that expectancy thwarted. The burden on the normal employer-employee contractual relationship will become intolerable.

## II

There will also be an added burden on the judicial process. Not only will innumerable breach of employment contract suits be transformed into equitable proceedings calling for special remedies, but there will inevitably be constant court challenges to the nature of the "fair hearing." The majority carefully sidestep the task of outlining the parameters of such a proceeding; with commendable candor they "recognize the practical limitations on the ability of private institutions to provide for the full airing of disputed factual issues." I can sympathetically understand their avoidance of defining the near indefinable. What is one person's fair hearing is another's inquisition.

In determining the right to a fair hearing, we must bear in mind the distinction in status. This plaintiff is not a physician seeking staff privileges in order to practice his profession as in *Ascherman* v. *Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507 [119 Cal.Rptr. 507], and *Ascherman* v. *San Francisco Medical Society* (1974) 39 Cal.App.3d 623 [114 Cal.Rptr. 681]. Plaintiff has been serving and seeks an injunction to continue serving as a medical resident. A resident is a physician who is receiving postgraduate training in a medical specialty by treating the sick and afflicted in a hospital, for which he is compensated not by the patients but by the hospital (see Bus. & Prof. Code, § 2147.5). Thus a resident is a categorical hybrid, being both an employee (*Martin* v. *Roosevelt Hospital* (2d Cir. 1970) 426 F.2d 155) and a student (*Regents of Univ. of Mich.* v. *Michigan Emp. Rel. Com'n* (1972) 38 Mich.App. 55 [195 N.W.2d 875]).

A staff physician, or his equivalent in other professions, cannot arbitrarily be denied the right to practice his profession (*Ascherman* v. *San Francisco Medical Society, supra,* 39 Cal.App.3d at p. 631) and he is entitled to a hearing before dismissal. When he loses staff privileges, a physician is unable to service his own patients and thus his ability to practice is undermined. A medical resident, on the other hand, is analogous to an employee whose tenure is terminable at will; as provided in Labor Code section 2922, "An employment, having no specified term, may be terminated at the will of either party on notice to the other." (*Wilson* v. *Red Bluff Daily News* (1965) 237 Cal.App.2d 87, 90

[46 Cal.Rptr. 591]; *Marin* v. *Jacuzzi* (1964) 224 Cal.App.2d 549, 553 [36 Cal.Rptr. 880].)

This plaintiff would clearly be a mere terminable-at-will employee but for his allegations of an orally promised three-year term and his acts in reliance thereon, i.e., selling his home and closing his private practice. These allegations appear to be sufficient as a matter of pleading to raise an estoppel against a statute of frauds defense to the breach of contract cause of action. But by the same token the declarations establish the fact that plaintiff was merely a medical resident undergoing postgraduate training and thus not entitled, under any existing authority, to the common law hearing procedures associated with a staff physician position.

To extend the right of a hearing to a trainee will mean, in the final analysis, that ultimate authority will be transferred from hospitals to courts. It seems clear to me that the competency of a medical resident can best be determined by the hospital chief of staff who supervises his training, rather than by judges. Yet the task will be cast upon the judiciary when it reviews, as it inevitably will be called upon to do, the procedures and results of a fair hearing.

### III

When we are importuned to judicially expand a common law concept we cannot overlook policy considerations and the practical repercussions.

A staff physician treats *his* patients at the hospital. He has full authority to prescribe the patients' treatment, he is subject to no supervision during the course of treatment, and he generally bears full responsibility for negligence. The situation of the medical resident is entirely different. He treats his *employer's* patients, by assignment of his employer, subject to supervision by the hospital's chief of surgery, and because of the employer-employee relationship the hospital is liable for his negligence under accepted principles of respondeat superior. (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258].)

In terms of the patient's frame of reference, when he engages a physician to treat an ailment he relies upon his doctor's expertise, not that of the hospital. When a patient enters a hospital on his own initiative for treatment, in an emergency or otherwise, he must rely upon the institution for assignment of one of its residents. If the resident is

competent, the hospital has chosen well; if the resident lacks training or skill, the hospital is held accountable.

These considerations underscore the importance to the hospital of maintaining control over the training and assignment of its medical residents. When a medical doctor is undergoing his residency, he understands it is a period of training out of which he may have a subjective expectation of qualifying in the future as a skilled expert in surgery or a related discipline. But to the chief of staff of the hospital this same period involves the welfare and reputation of the hospital. He must be able to select and retain only those residents who in his expert opinion will best serve the interests of the hospital and its patients. To impose upon hospital authorities the necessity of justifying in an adversary hearing these discretionary employment and instructional decisions appears to be an unreasonable burden on an institution which has as its primary function the alleviation of sickness and suffering.

I would affirm the judgment of dismissal after denial of the injunction, but would allow the matter to go to trial on the breach of contract causes of action.

Manuel, J., concurred.