[No. A113551. First Dist., Div. One. Dec. 27, 2006.]

HANS KURZ et al., Plaintiffs and Appellants, v.
FEDERATION OF PÉTANQUE U.S.A., Defendant and Respondent.

COUNSEL

Malcolm A. Misuraca for Plaintiffs and Appellants.

Geary, Shea, O'Donnell, Grattan & Mitchell and Raymond J. Fullerton, Jr., for Defendant and Respondent.

OPINION

**MARCHIANO, P. J.**—This case addresses the type of hearing that volunteer members of a nonprofit sports organization are entitled to when their organization disciplines them. Hans Kurz and Bill Carter, volunteer umpires, appeal

a judgment entered after the trial court denied their petition for writ of mandate. They sought the writ in order to compel the Federation of Pétanque U.S.A. (FPUSA) to vacate two decisions by FPUSA's board of directors (Board), made allegedly without a proper hearing, which suspended Kurz and Carter for one year from their positions as FPUSA umpires. As we discuss the issue below in the context of the nature of the nonprofit organization and its disciplinary procedure, we find no merit in plaintiffs' contentions and affirm the judgment.

## Background

FPUSA is a nonprofit sports organization, the purpose of which is to build a national body of affiliated clubs and individuals dedicated to spreading, practicing, and enjoying the game of pétanque.[1] Membership is open to individuals who reside in the United States. Groups of 10 or more individual members may apply for club membership. Umpires for member clubs, such as Kurz and Carter, are individual members in good standing who are nominated for the position, pass a test, and complete a confirmation process. FPUSA umpires are neither paid nor reimbursed for travel expenses.

An "umpire policy," adopted by FPUSA in March 2005, provides among other things that "[w]hether officiating or not, every umpire is required to conduct him/herself in a manner that complies with the rules of pétanque and that reflects well on all FPUSA umpires, the organization and the game of pétanque. Noncompliance . . . may be grounds for sanction up to and including loss of the umpire's license."

---

[1] Pétanque (from the Provençal "ped tanco," literally "feet together") is a version of boules, an outdoor bowling game of ancient origin. The Italian version is bocce. Pétanque was developed in France early in the last century, and is now played internationally according to rules most recently approved in 2002 at Grenoble, France, by the International Congress of the Fédération Internationale de Pétanque et Jeu Provençal. In pétanque, two individuals, two pairs, or two triples compete against one another. The object is to throw a metal ball, a boule, as close as possible to a smaller wooden ball, or jack, or alternately to throw a boule so as to knock an opponent's boule away from the jack. At the outset of play the jack is thrown by one of the teams—usually the team that won the previous play or who won the toss. To be a valid target, the jack must be thrown six to 10 meters from the throwing circle in which the players stand or squat. During each play the competitors throw three boules each, one at a time, if individuals or pairs are competing, or two boules each if triples are competing. At the end of a play the winning team is that which has a boule lying closest to the jack, and one point is awarded to that team for each of its boules that lie closer to the jack than any of the opposing team's boules. The first team to reach a set number of points—which varies between 10 and 13—wins the game. (See <http://www.petanque.org/news/rules/offical_rules.shtml> [as of Dec. 27, 2006]; <http://www.laboulebleue.fr/en/index.htm> [as of Dec. 27, 2006]; <http://www.petanque.org/beginners/> [as of Dec. 27, 2006].)

In 2005, the entry forms used in an FPUSA-sponsored tournament in Sacramento county included language prohibiting "smoking and drinking of alcoholic beverages on or off the courts while playing." On May 12, 2005, Kurz posted a message on an Internet Web site devoted to pétanque enthusiasts worldwide. In the message Kurz quoted the language from the entry form, describing it as a "new policy" of FPUSA, and said he was "curious how this situation is handled in other parts of the Petanque world." Carter saw Kurz's message, interpreted the language on the entry form to be inconsistent with existing rules,[2] and posted a reply. Carter stated FPUSA had not "put out" such a rule. He described it as a "fraudulent statement put on [the entry form] by Frank Pipal, the FPUSA Secretary." He suggested FPUSA leadership was at fault for allowing the language to be inserted on the entry form, stating that Pipal did "not run the FPUSA, unfortunately, no one does." Kurz posted a third message in response, creatively describing the entry form language as "kakamania." He also said that, if Carter were to umpire the tournament, he "strongly encourage[d]" him not to enforce it.

Kurz's second Internet posting prompted a complaint[3] from the chairman of the sport committee of FPUSA, Louis Toulon, which he sent to FPUSA president John Rolland on May 26, 2005. The complaint was also addressed to several other FPUSA members, including Kurz. Toulon stated that Kurz's publicly posted remarks were "a possible breach of the umpire code," citing to the umpire policy quoted above. The following day, Kurz corresponded with Rolland, providing an initial statement in his defense. Rolland forwarded this response to Gilles Canesse, chairman of the FPUSA disciplinary committee (Committee), and informed Kurz that the Committee would be reviewing the matter. In early June 2005, Kurz corresponded with Canesse, providing him with letters of support and further statements in his defense.

The Committee subsequently determined that Kurz's posted message did violate FPUSA's umpire policy. It reported this determination to the Board, recommending that it suspend Kurz's umpire credential for one year, and thereafter place him on a two-year period of "umpire probation," "during which time any misconduct . . . result[ing] in a Disciplinary Committee enquiry may be considered cause for permanent revocation of [his] Umpire's Credential." On July 13, 2005, the Board adopted this recommendation by a

---

[2] FPUSA bylaws include a "Code of Behavior" for FPUSA members competing in FPUSA-sponsored events. Among other things, the code prohibits "[e]xcessive consumption of alcoholic beverages," and "smoking or drinking of alcoholic beverages during play."

[3] This complaint, as well as all subsequent communications, were sent and received as e-mail messages.

vote of 13 to one, with two Board members abstaining. Pipal, one of the Board members, averred subsequently that he abstained from voting because the posting by Carter, which had prompted Kurz's posting, referred to him by name. Pipal notified Kurz of the Board's ruling on July 20, 2005.

Meanwhile, on July 10, 2005, Robert Pierre sent a message to Pipal and others. In it, he requested that a "review[]" be conducted regarding the message that Carter had posted on the Internet site. He objected to Carter's message because it had "mentioned a FPUSA board member [by name] in his capacity as an umpire" and it had included remarks that were "not only uncouth but . . . more like libel." On July 12, 2005, Rolland sent a complaint to the Committee in which he complained that "[f]or years the FPUSA [has been] dealing with the negative and damaging comments of . . . Carter towards the leadership of the [FPUSA]." Rolland suggested that the Committee "revoke . . . Carter's umpire license and suspend him from FPUSA activities for a long time if not forever." Pipal sent a message to Carter two days later, informing him that Rolland had "referred the matter of [his Internet posting] to the Disciplinary Committee for review." Pipal's message included a copy of the Internet posting at issue. Carter responded with a message to Canesse, asking him for clarification of the nature of the complaint against him, and what rule he had allegedly violated. Canesse replied by forwarding a copy of Rolland's complaint. He also cited several "excerpts [he] considered relevant" to the Committee's deliberations. These included an FPUSA rule, which charges umpires with the duty of "ensuring that the rules of the game and the administration rules are strictly adhered to," the FPUSA Code of Behavior, and a section of FPUSA's constitution which provided that members "may be expelled from membership by a two-thirds . . . majority of votes [of the] Board of Directors . . . [but that] [s]uch a vote shall not be taken . . . until after the member . . . has been advised of the proposed action and given the opportunity of being heard by the Board of Directors." Canesse also quoted the umpire policy that we noted above. He stated that the fact Carter was an umpire was "relevant" to the Committee's review.

At this point, Carter retained counsel and asked for an extension of time to prepare a "formal response." He also sought a hearing, preferably in California "where the most obvious witnesses for and against him will be found." On August 4, 2005, the Committee sent a message to Carter stating that "[t]he only issue before [it], at this time, involve[s] certain of your internet postings, and whether they violate the 2005 Umpire Policy." Thus, "[t]he only sanctions that [may] be rendered . . . relate to your serving as an FPUSA umpire." It stated explicitly that no action regarding membership revocation

was being considered. The Committee also informed Carter that it conducted its business by e-mail and that Carter should submit his defense in writing. Further, the Committee "saw no need for further witnesses" since "[t]he internet postings speak for themselves." On August 7, 2005, Carter submitted to the Committee a formal written response to Rolland's complaint.

At the end of August 2005, the Committee determined that Carter had violated the umpire policy, reported its determination to the Board, and recommended that Carter receive the same sanction it had imposed on Kurz—a one-year suspension of his umpire credential and a two-year probationary period. By an e-mail message sent September 13, 2005, Pipal notified Carter that the Board had adopted the Committee's recommendation. Later, he averred that the Board's vote had been nine to two, with himself and one other Board member abstaining from the vote.

Kurz and Carter filed a petition for writ of mandate in the Sonoma County Superior Court on September 30, 2005, choosing that forum evidently because Pipal was a resident of Sonoma. They alleged that FPUSA, in suspending their umpire credentials, had violated their "common law right of fair procedure" and had improperly sanctioned them for "exercising their right of free speech." Specific violations of "fair procedure" included the failure of FPUSA to provide Kurz with a written copy of the complaint against him; its improper pursuit of a charge that had not been explicitly included in Rolland's complaint against Carter; its failure to follow the disciplinary procedures set out in its own bylaws;[4] its failure to respond to Carter's requests for clarification of the charges against him; its failure to provide either Kurz or Carter with a formal hearing; its failure to provide a record of the Committee's proceedings against them; its failure to exclude Canesse, Pipal, Rolland, and several others from the proceedings because of their bias against Kurz and Carter; its pursuit of a pretextual charge against Carter in a proceeding actually motivated by the malice of Pipal, Rolland, and others; its pursuit of sanctions against them merely for exposing the improper promulgation of a false rule, which they were bound to do as umpires; the pursuit of charges that they had violated an "umpire policy" that had not yet been finally adopted until after the complaints against them were

---

[4] The Code of Behavior set out in FPUSA bylaws states that complaints against members must "identify those filing the complaint, . . . the subject of the complaint, of what the complaint consists and the evidence supporting the complaint including names and witnesses." The chairman of the Committee must then "cause an investigation to take place and present the results to the Committee for decision." If the Committee decides to "withdraw the license of the person who is subject of the complaint, that person may appeal the decision to the Board of Directors."

filed; and its failure to specify in the umpire policy any formal disciplinary procedure and the body authorized to conduct such proceedings.

One week after filing their petition, the court signed an order prepared by counsel for Kurz and Carter. The order directed FPUSA to appear on November 30, 2005, to show cause why the court should not issue a "temporary or preliminary" writ of mandate reinstating them to their positions as umpires. On November 30, 2005, the court continued the matter. FPUSA filed a return by verified answer on January 17, 2006. Its opposing papers included declarations with attached exhibits. Kurz and Carter subsequently filed reply papers that included their own supporting declarations with attachments.

At the hearing on February 17, 2006, none of the parties appeared and the court adopted its tentative ruling, which denied the petition. (See Cal. Rules of Court, rule 324; Super. Ct. Sonoma County, Local Rules, rule 5.6.) In stating its reasons for the ruling, the court concluded that the common law doctrine of fair procedure was not applicable to the proceedings in issue, because the proceedings had not implicated three "essential elements" that limited application of the doctrine. That is, FPUSA was not a private organization "engaged in activities affecting the public interest," its proceedings had not impaired a "substantial economic interest" possessed by Kurz or Carter, and FPUSA's action had not "excluded or expelled [them] from [its] membership."

The court also found that FPUSA had afforded Kurz and Carter a "fair procedure." Specifically, each had been "notified of the complaint, permitted to make a written statement in defense, and permitted to submit any other written materials, including written statements by third parties." The court noted additionally that the Board had acted to ensure fairness in the proceedings, in that Pipal and another Board member had abstained from voting. Finally, the court found that the sanctions, which involved "suspension of the privilege to umpire," but not "expulsion from the organization or any restriction upon membership status," was "wholly consistent with FPUSA rules."

On March 15, 2006, the court entered both a formal order denying the petition, and a "Judgment of Dismissal." This appeal followed. (Code Civ. Proc., § 904.1, subd. (a); see *Catalina Investments, Inc. v. Jones* (2002) 98 Cal.App.4th 1, 5, fn. 3 [119 Cal.Rptr.2d 256].)

## Discussion

### A. *Standard of Review*

When reviewing a trial court's ruling on a petition for traditional writ of mandate, we review any findings under the substantial evidence standard. We review independently questions of law based on undisputed facts or facts properly found by the trial court. (See *Lomeli v. Department of Corrections* (2003) 108 Cal.App.4th 788, 794 [134 Cal.Rptr.2d 179]; see also Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2005) ¶ 8.4.2, pp. 8-2 to 8-3.)

### B. *Corporations Code Section 7341*

The Corporations Code's Nonprofit Corporation Law (Corp. Code, § 5000 et seq.) includes a part governing the formation and operation of nonprofit mutual benefit corporations. (Corp. Code, § 7110 et seq.) Under this part, a nonprofit mutual benefit corporation may, by its articles or bylaws, provide for the admission of persons to membership. (Corp. Code, § 7310 et seq.) Such a corporation may not expel or suspend a member, nor may it terminate or suspend any membership, except according to procedures that satisfy the requirements of Corporations Code section 7341. (Corp. Code, § 7341, subd. (a).) This section requires that any expulsion, suspension, or termination of a member or membership be conducted in good faith and in a fair and reasonable manner. (Corp. Code, § 7341, subd. (b).) A corporation's procedure in taking such action is deemed to be "fair and reasonable" when: (1) its provisions have been set forth in the articles or bylaws, or copies of the provisions are sent annually to all members pursuant to the articles or bylaws; (2) the procedure provides for 15 days' prior notice of any proposed expulsion, termination, or suspension and the reasons for such action; and (3) the procedure provides an opportunity for the member to be heard, orally or in writing, not less than five days before the effective date of the proposed action, by a person or body authorized to determine whether or not the proposed action should be taken. (Corp. Code, § 7341, subd. (c).) A court, however, may find "other procedures to be fair and reasonable when the full circumstances . . . are considered." (Corp. Code, § 7341, subd. (b).)

Kurz and Carter contend it was error to deny their petition for writ of mandate because FPUSA did not comply with the requirements of Corporations Code section 7341. Specifically, they urge that FPUSA did not act in good faith. They also contend that FPUSA failed to utilize procedures

that comply with those specified in Corporations Code section 7341, subdivision (c), in that it failed to follow the disciplinary procedures it had published in the Code of Behavior portion of its bylaws. (See fn. 2, *ante.*)

The verified petition and answer, taken together, establish that FPUSA is a nonprofit corporation formed in Washington, D.C. FPUSA argues that, as a foreign corporation, it was not subject to the requirements of Corporations Code section 7341. Yet a foreign corporation may be subject to section 7341, as well as other provisions of the Nonprofit Mutual Benefit Corporation Law (Corp. Code, § 7110 et seq.), to the extent it conducts business within California. (See Corp. Code, § 8910.) Since FPUSA failed to raise this argument below, we assume for the sake of argument that Corporations Code section 7341 may apply to FPUSA in an appropriate case.

But this is not such a case. Corporations Code section 7341 applies only when the proposed action is to expel or suspend a member of the corporation, or to terminate or suspend a membership.[5] (Corp. Code, § 7341, subd. (a).) Kurz and Carter argue, as they did below, that Corporations Code section 7341 should still be applicable because the result of the proceedings against them *could* have resulted in their suspension or expulsion from membership. The record, however, does not support this argument. With respect to the proceedings against Kurz, the initial complaint sent by Toulon was limited on its face to a charge that Kurz's Internet posting was a possible breach of the umpire policy. As we have noted, this policy states that any violation "may be grounds for sanction up to and including loss of the umpire's license." In Kurz's case, there is no indication the Committee *ever* considered any sanction other than the suspension of Kurz's umpire license.

With respect to Carter, it is true that the initial complaint sent by Rolland asked the Committee to consider not only revoking Carter's umpire credential, but also suspending him "from FPUSA activities for a long time if not forever." It is also true that, when Carter initially sought clarification of the charges against him, Canesse, responding on behalf of the Committee, quoted bylaws and rules it deemed "relevant" to Carter's case, and these quoted excerpts suggested the possibility of action suspending or terminating his

---

[5] FPUSA argues that the application of Corporations Code section 7341 is even further limited, in that it applies only to proceedings against "statutory" members, who are generally those with voting rights. (See Corp. Code, § 5056, subd. (a).) We are disinclined to accept that the Legislature intended the term "member" to be so limited with respect to the procedural safeguards of Corporations Code section 7341. Moreover, a nonprofit corporation may, through its articles or bylaws, confer some or all of the rights of membership upon persons who have no voting rights. (Corp. Code, § 5056, subd. (b).) We conclude FPUSA did just that when it adopted constitutional articles providing for individual, club, and commercial memberships.

membership. Nevertheless, in its message to Carter dated August 4, 2005, the Committee in essence amended and clarified its proposed action, stating that it was considering *only* the issue whether Carter's Internet posting violated the umpire policy. It also explicitly stated that it was *not* considering any sanction that would affect Carter's membership.

■ We conclude Corporations Code section 7341 did not govern Kurz's case, because his rights as a member of FPUSA were never implicated. This section also did not apply in Carter's case once the Committee notified him that it was not considering any action involving his membership rights.

More importantly, we observe that the trial court found Kurz and Carter "were afforded a fair procedure." In doing so, it necessarily rejected their argument that FPUSA had violated Corporations Code section 7341. In our view, implicit in this finding is a determination that, even if the proceedings did not comply with the procedural requirements specified in section 7341, subdivision (c), they were nevertheless "fair and reasonable [under] the full circumstances." (Corp. Code, § 7341, subd. (b).)

The evidence presented in the record, including the facts summarized above, is essentially undisputed[6] and does not compel the conclusion that either the Committee or the Board conducted its proceedings in bad faith. On the other hand, it does show that both Kurz and Carter received adequate, actual notice of the proposed actions against them, and that both were able to avail themselves of an opportunity to present a written defense. At the time of these proceedings, the procedures set out in the FPUSA bylaws applied only when membership rights were implicated—FPUSA was not bound to follow them in proceedings involving only the suspension of umpire credentials. Moreover, it appears the nonprofit FPUSA, at least at the time of these proceedings, had a limited ability to provide formal hearings in any disciplinary proceeding. The record shows that the Committee and the Board routinely conducted business "via e-mail" because the members of these bodies were far-flung and FPUSA had little income to fund travel expenses.[7]

---

[6] The material evidence consists of the Internet postings that initiated the proceedings, the applicable articles, bylaws, and rules, and the exchange of e-mail messages and written statements that comprised the proceedings themselves. Some averments in the declarations appear to raise disputed issues of fact, but on examination are no more than differences in the interpretation of the underlying evidence. For example, Kurz averred that he was charged with violating an umpire policy that was not adopted until August 2005, after the conclusion of the proceedings against him. The evidence, however, shows that the umpire policy quoted above was adopted on March 7, 2005. That policy was *revised* in August 2005 to specify procedures for handling complaints regarding umpire conduct and proficiency.

[7] FPUSA's total income for 2005 was $16,904. Over $10,000 of this amount was committed to insurance, international dues, and other expenses.

On review of the undisputed evidence, we arrive independently at a conclusion in agreement with the trial court's implicit determination: The proceedings against Kurz and Carter were fair and reasonable under the full circumstances and did not violate Corporations Code section 7341.

## C. *Common Law Right to Fair Procedure*

■ "The purpose of the common law right to fair procedure is to protect, in certain situations, against arbitrary decisions by private organizations." (*Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060, 1066 [95 Cal.Rptr.2d 496, 997 P.2d 1153] (*Potvin*).)[8] When this common law doctrine applies, a private organization is required to proceed in its decisionmaking process in a manner that is both " 'substantively rational and procedurally fair.' " (*Ibid.*, quoting *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 550 [116 Cal.Rptr. 245, 526 P.2d 253].)

As noted above, Kurz and Carter argued below that the common law right of fair procedure applied to the proceedings against them. In reiterating this argument on appeal, they rely chiefly on *Ezekial v. Winkley* (1977) 20 Cal.3d 267 [142 Cal.Rptr. 418, 572 P.2d 32] (*Ezekial*).

In *Ezekial,* a licensed physician accepted an offer by a private teaching hospital to enter and participate in its surgical residency program. Successful completion of the program was necessary for the physician to attain the status of a board certified general surgeon. The hospital dismissed the physician from its program without providing any notice or hearing. The physician brought an action seeking, among other things, injunctive relief requiring his reinstatement pending the hospital's compliance with the common law requirements of "fair procedure." In reversing a judgment of dismissal, which followed an order sustaining the hospital's demurrer, the Supreme Court held that the physician had adequately pleaded a cause of action under the "fair procedure" doctrine. (*Ezekial, supra,* 20 Cal.3d at pp. 269–270, 279.)

In the course of its decision the Supreme Court discussed the development of the "fair procedure" doctrine. It noted the doctrine had been "rather narrowly applied to situations with substantial economic ramifications," at

---

[8] The Supreme Court first applied the common law right to fair procedure in a late 19th century decision, *Otto v. Tailors' P. & B. Union* (1888) 75 Cal. 308, 315 [17 P. 217], in which the court held that an unincorporated trade union's expulsion of a regular member for an offense subject to a fine was "not in good faith [and] was not fair."

least with regard to proceedings in which private organizations had *excluded* one or more individuals from membership. (*Ezekial, supra,* 20 Cal.3d at p. 272.) But courts had given the doctrine a "broader application" in cases involving private organizations that had *expelled* members. (*Ibid.*) The Supreme Court stated that, in these cases, "[t]he underlying theme . . . is that membership in an association, with its associated privileges, once attained, is a valuable interest which cannot be arbitrarily withdrawn." (*Id.* at p. 273.) Thus, these decisions "comport[ed] with the broader principle that one on whom an important benefit or privilege has already been conferred may enjoy legal protections not available to an initial applicant for the same benefit." (*Ibid.*)

Citing the above quoted language, Kurz and Carter insist that the Supreme Court in *Ezekial* thereby affirmed a line of expulsion cases in which the need to demonstrate an impaired economic interest was relaxed. They suggest, in other words, that the trial court's ruling was error to the extent it determined the "fair procedure" doctrine was inapplicable because the proceedings at issue had not "impair[ed] the affected individual's substantial economic interest."

First, we observe that this language from *Ezekial* is mere dicta, in which the Supreme Court is attempting to describe a "theme" underlying its earlier expulsion cases. Elsewhere, the Supreme Court was careful to point out the impairment of a significant economic interest in the case before it. It emphasized that the physician had alleged facts indicating the hospital had "assumed the power to permit or prevent [his] practice of a surgical specialty and to thwart [his] enjoyment of the *economic* and professional benefits flowing therefrom." (*Ezekial, supra,* 20 Cal.3d at p. 274, italics added.) Further, in its later decision in *Potvin,* the Supreme Court again analyzed two of its earlier expulsion cases, and observed that in each case it had applied the doctrine "to protect the affected member's property rights." (*Potvin, supra,* 22 Cal.4th at p. 1066.)

Even if we accept the dictum in *Ezekial*—that the common law "fair procedure" doctrine should be applied more broadly in expulsion cases, this is not such a case. As the Supreme Court in that decision said, such broader application is premised on the "valuable interest" in membership rights. (*Ezekial, supra,* 20 Cal.3d at p. 273.) Here, the action by FPUSA implicated only Kurz's and Carter's positions as unpaid umpires.[9] Kurz and Carter have

---

[9] At oral argument, counsel for Kurz and Carter again emphasized that the Committee's proceedings against them had placed their membership rights in "jeopardy." He reasoned this was so because the Committee failed to make it sufficiently clear that the proceedings did *not* implicate their membership rights, and because FPUSA bylaws authorized the Committee to conduct disciplinary proceedings *only* when membership rights *were* at stake. (See fn. 4, *ante.*)

not drawn our attention to any authority that has applied the common law "fair procedure" doctrine in any analogous situation, where the private organization's action has not adversely implicated either an economic interest or a fundamental membership right. (Cf. *Kim v. Southern Sierra Council Boy Scouts of America* (2004) 117 Cal.App.4th 743, 747–748 [11 Cal.Rptr.3d 911] [declining to extend application of the doctrine to a situation in which the alleged detriment suffered was "the absence of the prestige and honor associated with a specific rank in or award conferred by a . . . social organization . . . whose formation and activities are unrelated to the promotion or advancement of the economic or business interests of its members"].) No policy reason or rationale from any case compels us to extend the principle to encompass internal decisions that are unrelated to exclusion or expulsion from membership or that do not adversely impair a member's economic interest.[10] Moreover, common sense and judicial restraint would also dictate that a court should not involve itself in internal disciplinary actions of the type involved in this case.[11] Such determinations are better left to the discretion and expertise of the nonprofit mutual benefit organization's governing board. Two policy concerns raise a flashing yellow light: judicial attempts to construe laws of private organizations may lead the court into what one law professor characterized as the "dismal swamp," and also may

---

It is true that, at the time of the proceedings against Kurz and Carter, the umpire code did not yet specify whether the Committee—or any other body—had authority to conduct disciplinary proceedings for violations of that code. Nevertheless the record is clear that, in the proceeding against Kurz, the Committee gave him clear notice of, and an opportunity to respond to, a charge that involved *only* an umpire code violation and hence *only* implicated his umpire credentials. In the proceeding against Carter, the Committee ultimately and explicitly limited its charge against him to one that implicated *only* his umpire credentials, and it gave Carter an opportunity to respond to that charge.

[10] See *Salkin v. California Dental Assn.* (1986) 176 Cal.App.3d 1118, 1121–1124 [224 Cal.Rptr. 352].

[11] The bounds of judicial restraint in applying the common law "fair procedure" doctrine are illustrated by *Von Arx v. San Francisco Gruetli Verein* (1896) 113 Cal. 377 [45 P. 685] (*Von Arx*), one of the two early "expulsion" cases described by the Supreme Court in *Potvin*. (See *Potvin, supra*, 22 Cal.4th at p. 1066.) The decision in *Von Arx* involved the expulsion of a member by an unincorporated association that had been organized for "intellectual intercourse and mutual aid and benevolence." (*Von Arx, supra*, 113 Cal. at pp. 378–379.) The Supreme Court observed "[i]t is, perhaps, unfortunate that the general law takes notice of the rights of persons as members of voluntary associations organized *for such purposes* as those contemplated by the [association] herein. It would, perhaps, be better if a person joining such a society should be forced to look alone to the society itself for the protection of his rights *as a member* of it. But . . . *courts have felt compelled to listen, reluctantly, to complaints of their members in certain cases.* This is particularly so where, as in the case at bar, *ordinary property rights are involved.*" (*Id.* at p. 379, italics added.) In a later opinion, which involved a labor union's expulsion of a member resulting in his loss of employment, the Supreme Court similarly observed that "[*i*]*n cases of this type* we must strive both to protect the rights of individual members and *to avoid impairing the right of the union to govern itself.*" (*Cason v. Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 143 [231 P.2d 6], italics added.)

lead to the infringement on autonomy for private voluntary organizations. (*Berke v. Tri Realtors* (1989) 208 Cal.App.3d 463, 467 [257 Cal.Rptr. 738].)[12]

■ Although we have held that the fair procedure doctrine does not apply to this case, we note that the trial court determined the procedure utilized was fair. We conclude that this ultimate finding includes an implicit determination, not only that the proceedings satisfied the requirements of Corporations Code section 7341, but also that they satisfied the common law "fair procedure" doctrine. Whether a procedure is "fair" under the common law doctrine depends on the particular circumstances and the purpose and nature of the organization. The panoply of due process is elastic and must be understood in the context of the organization, its membership, the discipline to be imposed, and the member's valuable interest affected by the action. (See *Ezekial, supra,* 20 Cal.3d 267.) To be informed of the charges, the proposed disciplinary action, and an opportunity in some manner to present countervailing evidence may satisfy the twin due process requirements of being substantively rational and procedurally fair, as opposed to a full-blown adversarial process with the right to counsel and cross-examination.[13] Under some circumstances, for example, a mere written response may be deemed fair, as opposed to a formal hearing. (See *Ezekial, supra,* 20 Cal.3d at p. 279.) In light of the evidence discussed above,[14] we agree with the trial court's implicit determination that the proceedings against Kurz and Carter did not violate the common law "fair procedure" doctrine, if that doctrine were applicable.

D. *The Entry of Judgment Following Denial of a "Temporary" Writ*

The trial court's hearing on February 17, 2006, was prompted by an order drafted by counsel for Kurz and Carter, which sought issuance merely of a "temporary" or "preliminary" writ of mandate. Kurz and Carter complain that it was therefore improper for the trial court to deny the petition in its entirety after that hearing, and error to enter the subsequent judgment of dismissal. They also suggest the trial court improperly failed to consider the evidence that they submitted in support of the petition, because it never referred to their evidence in its ruling.

---

[12] See Chafee, Jr., *The Internal Affairs of Associations Not for Profit* (1930) 43 Harv. L.Rev. 993, 1021–1029 for a discussion of policies against judicial interference.

[13] We note a "fair" procedure may simply provide for only a written submission by the affected member. For example, Corporations Code section 7341, subdivision (c)(3) provides a procedure is "fair and reasonable" when it affords an opportunity for the member to be heard orally or in writing before the authorized body.

[14] See footnote 6, *ante,* and accompanying text.

■ We find no merit in these contentions. The proceeding below was consistent with the governing procedural law. The trial court issued an order to show cause. In doing so it clearly treated the order—notwithstanding its incorrect wording—as the functional equivalent of an alternative writ. An alternative writ directs the respondent to perform the act sought to be compelled or else appear and show cause why it has not been performed. (See Code. Civ. Proc., § 1087.) This prompts a return to the *petition*, which FPUSA duly filed in the form of a verified answer. (Code Civ. Proc., § 1089.) The reply and supporting evidence filed by Kurz and Carter performed the function of countervailing proof. (Code Civ. Proc., § 1091.) At that point, the court had jurisdiction to hear and determine the merits of the *petition*. (See *Bleuel v. City of Oakland* (1927) 87 Cal.App. 594, 600 [262 P. 477]; see also Code Civ. Proc., § 1090.) It was entitled to do so on the basis of the evidence submitted in the form of declarations. (See Cal. Rules of Court, rule 323.) The court made its determination at the hearing on February 17, 2006, which it denoted in the minutes as a hearing on the *petition*. The order entered after this hearing made findings and denied the *petition*. Such an order is typically followed by a judgment of denial. (See *Cody v. Justice Court* (1966) 238 Cal.App.2d 275, 277, fn. 1 [47 Cal.Rptr. 716].) We construe the "Judgment of Dismissal" to be just that—a judgment denying the *petition* on the merits.[15]

The court did not err simply because counsel for Kurz and Carter framed the order to show cause as one seeking a "temporary" writ of mandate. Under California law there is no such creature. If Kurz and Carter misunderstood the nature of the order their counsel drafted, due to its incorrect wording, they have shown no prejudice. They submitted evidence in support of the petition. If it was designed only to support the issuance of a "temporary" writ of mandate, Kurz and Carter make no claim that they mistakenly omitted other additional evidence that might have been material to the determination of the petition itself.

■ As the trier of fact, the trial court was entitled to weigh the evidence and resolve any conflicts. The fact that it did not mention the evidence submitted by Kurz and Carter by no means demonstrates that it improperly failed to consider that evidence. Error must be affirmatively shown. (*Consaul v. City of San Diego* (1992) 6 Cal.App.4th 1781, 1792 [8 Cal.Rptr.2d 762].)

---

[15] The judgment was drafted not by the court, but by counsel for FPUSA, the prevailing party.

## Disposition

The judgment is affirmed.

*Stein, J., and Swager, J., concurred.*